**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 08-1746**

_____

PENNSYLVANIA ELECTRIC COIL, LIMITED,

        Plaintiff - Appellant,

    v.

CITY OF DANVILLE,

        Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of Virginia, at Danville. Jackson L. Kiser, Senior District Judge. (4:06-cv-00080-jlk-mfu)

_____

Argued: March 27, 2009          Decided: May 11, 2009

_____

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Chauncey Reynolds Keller, Jr., ULMER & BERNE, Cleveland, Ohio, for Appellant. Jeremy E. Carroll, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellee. **ON BRIEF:** Neil W. Gurney, ULMER & BERNE, Cleveland, Ohio; Glenn W. Pulley, Amanda M. Morgan, CLEMENT & WHEATLEY, Danville, Virginia, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises out of a dispute over the responsibility for costs exceeding the contract price for work done on three hydroelectric generating units, which supply power to the City of Danville, Virginia ("the City"). Pennsylvania Electric Coil, Ltd. ("PEC") and the City entered into a contract under which PEC would disassemble, rewind, refurbish, and reassemble the units. PEC incurred extra costs to complete the work, which the City ultimately refused to pay. PEC sought recovery, alleging claims for breach of contract and quantum meruit. The district court granted summary judgment in favor of the City, and PEC now appeals on its quantum meruit claim. Because the parties have an express, valid contract that prescribes a change order procedure to obtain approval and payment for extra work, PEC's quantum meruit claim fails under Virginia law. We therefore affirm the judgment of the district court.

I.

In March 2003, the City of Danville issued an Invitation for Bids ("IFB") on a project to disassemble, rewind, refurbish, and reassemble three hydroelectric units ("Units 1, 2, and 3"), which supply power to the City as part of the Pinnacles Hydro Dam on the Dan River. The City hosted a prebid meeting at the

2

dam in April 2003 and allowed six potential bidders to tour and inspect the facility, ask questions, and seek modifications to the proposed contract. PEC submitted a bid in May 2003 in which it affirmed that it had "visited the site and become familiar with and [was] satisfied as to the general location and site conditions that may affect cost, progress, and performance or furnishing of the Work." J.A. 282.

The City ultimately awarded the contract to PEC for $882,000 in August 2003. The parties' fixed-price contract consisted of, among other things, a four-page agreement describing the work to be done, the City's IFB, and the City of Danville Procurement Code. These documents outlined several constraints on the contract price and the manner in which the parties could agree on any increases to that price. Article 7 of the contract stated:

> Notwithstanding any other provision of this contract to the contrary, the total obligation of the City shall not exceed $882,000.00 and no increase shall be made to this amount except by a written amendment executed by officials of the City and [PEC] who are authorized by law to execute agreements.

J.A. 14. In addition, article 8.e of the contract stated that PEC "shall bear all losses resulting from the amount or character of the work being different, or because the nature of the premises on which the work is done is different from what

3

was expected or on account of the weather, or similar causes."

Id. Further, section 15.1 of the IFB stated:

> The City, without invalidating any construction contract, and without notice to any surety, may order changes in the work within the general scope of the contract consisting of additions, deletions, or other revisions, providing the total amount added or eliminated does not exceed twenty-five percent (25%) of the total contract price, or $10,000, whichever is greater. All such changes in the work shall be authorized by change order, and shall be executed under the applicable conditions of the contract documents.

J.A. 206. This 25% cap on price increases is mandated by Virginia state law, Va. Code § 2.2-4309, and is restated in section 30-13 the Danville Procurement Code, J.A. 398.

PEC began working on the project in October 2003. Significantly for purposes of the issue before us, the project required cost adjustments for work beyond the scope of the contract. PEC submitted written requests for and was granted authorization to conduct such work on several occasions at the outset of the project. For example, on October 14, 2003, PEC submitted a written proposal to perform a heat run test on Unit 1, suggesting that "it would be in the best interest of all concerned if a heat run test was performed on one of the units at the City of Danville Pinnacles Hydro Station while it was in service." J.A. 436. Noting that "[t]his heat run test . . . was not specified and, if opted for, would be an extra charge,"

4

(emphasis added), the proposal included a suggested testing schedule and stated that the price for such a test would be $17,500. Id. at 436-37. The City approved the heat run test in December 2003 and issued a Purchase Order signed by Gary Via, the City's Director of Purchasing. Id. at 439-40.

Also, after performing the heat run test and an uprate study required by the parties' contract, PEC submitted a written proposal in March 2004 recommending additional work and design changes for all three units. J.A. 442-43. The written proposal noted that these changes "will require additional actions outside of the existing work scope;" laid out PEC's "pricing to complete the [required] actions;" and "request[ed] that the contract between Pennsylvania Electric Coil and The City of Danville . . . be revised to include the above workscope and associated costs." Id. (emphasis added). The City ultimately approved two of the recommended changes and issued a Purchase Order signed by Gary Via in June 2004. J.A. 447.

PEC subsequently began working on the disassembly of Unit 1 and determined that certain parts required repairs that the parties had not originally anticipated. In August 2004, PEC submitted a list of prices for these repairs, which totaled $23,065. J.A. 449-50, 52. The City approved these repairs and issued a Purchase Order signed by Gary Via in September 2004.

5

J.A. 454. Work on Unit 1, including the reassembly and alignment, proceeded into early 2005. PEC also began work on Units 2 and 3 in March or April 2005.

This lawsuit primarily arises out of alignment and plumb work related to all three units, as well as additional repair work performed on Units 2 and 3 (together, "the disputed work"). During the course of PEC's performance, the parties disagreed on whether PEC's alignment work fell under the scope of the contract. Although the contract called for "shaft alignment" after the units were reassembled, J.A. 236, it also required each unit to "be assembled to the existing alignment and plumb condition," id. at 233 (emphasis added). PEC discovered that the units were out of alignment at the outset of the project, a circumstance that the contract did not anticipate.[1] The record contains correspondence and documentation of conversations between the parties through the spring of 2005, discussing alignment problems for all three units as well as PEC's concern that the contract failed to address the fact that units were already out of alignment.

---

[1]PEC also asserts that the contract did not accurately describe the necessary methods for the disassembly and reassembly work, and in some cases required "methods and procedures which were contrary to known industry standards." Petr.'s Br. at 12.

For example, a January 11, 2005 e-mail from Tim Jablonski, a City engineer, noted that PEC and City employees had "discussed the alignment and bearings" and that PEC's field supervisor had pointed out that "the contract does not have provisions to correct the plumb if [it is] out of tolerance." J.A. 639. The e-mail further stated that "Penn Coil would like to submit an adder if they have to adjust plumb or make any alignment moves." Id. An April 7, 2005 letter from PEC to Phil Slate, the Pinnacles Hydro Dam supervisor, quotes a $2,000 price for adjusting the alignment for Unit 3's sole plate, which "is out of flat by .033 in[ches]." J.A. 477. The record also contains a June 24, 2005 e-mail from David Summers, another City engineer, memorializing a phone conversation between PEC employees and City engineers. J.A. 522-23. In the e-mail, Summers noted that PEC's field supervisor, Mark Wenckus, "felt there was additional work performed on alignment" for all three units and that Wenckus had "submitted a spreadsheet on 2/11/05 to Brad Child [PEC's General Manager] with his estimate" of the extra cost for this additional alignment work. Id. at 522. Summers further noted that Brad Child had received Wenckus's spreadsheet, "but had never forwarded it to [the Pinnacles Hydro Dam supervisor] or requested a Change Order" or otherwise "provided any written notification that a potential Change Order

7

issue existed." Id. Summers indicated that he "encouraged" PEC to contact the City "immediately in writing if [PEC] intended to request additional compensation regarding field work they felt was out of scope." Id. at 523. Significantly, he noted stressing to Brad Child "that the City is not obligated to [make] any additional payment since no change order was requested or approved in advance of the work being completed." Id.

Notwithstanding PEC's concerns during the spring of 2005 about "field work they felt was out of scope," J.A. 523, and reminders from the City about the need for change orders, the record contains only three written price increase proposals from PEC in 2005: two submitted in April 2005 for concrete repairs to Unit 3's sole plate and for alignment work on Unit 3's stator and sole plate; and one submitted in May 2005 for modifications to the Unit 2 turbine housing. J.A. 475, 477, 485. The City did not issue a Purchase Order to authorize any of these proposed changes. The only change that the City did approve in 2005, through a letter written by Gary Via, was a written request from Mark Wenckus on May 6, 2005 to extend the contract completion deadline for two weeks because Wenckus had discovered that Unit 2's "vertical centerline was out of industry standard tolerance for a hydraulic turbine and generator of its type."

J.A. 641. During the course of the parties' discussions concerning the alignment work and additional repairs, work on all three units steadily progressed. All work on Unit 1 was completed by February 2005, while work on Units 2 and 3 continued through June 2005.

PEC completed work on Units 2 and 3 in June 2005 and the units were restarted that month. On July 29, 2005, PEC presented the City with three final invoices for "additional work" on the units. J.A. 498–501. PEC billed $60,785 for Unit 1, $110,387 for Unit 2, and $107,875 for Unit 3.[2] Of the original invoiced amounts, the City ultimately paid PEC a total of $52,902.[3] The City left unpaid a balance of $226,145, which included costs relating to the alignment work that totaled at least $216,785.

PEC filed an action against the City, alleging claims for breach of contract and quantum meruit. The district court

---

[2]These invoices represent bills for amounts in addition to the contract price.

[3]The parties dispute whether this amount reflects work that a City official had approved in advance under the terms of the contract. PEC asserts that $30,620 of this sum reflects work for which the City had never issued a purchase order. Petr.'s Br. at 23. However, the City asserts that it "made these payments because it determined, in good faith, that the amounts were outside the scope of the Contract, PEC had provided prices in advance of the work, and the work had been approved in advance by the proper City official." Respt.'s Br. at 18.

granted summary judgment in favor of the City, and this appeal of the quantum meruit claim followed.

## II.

We review de novo the district court's grant of summary judgment. Jennings v. Univ. of N.C., 482 F.3d 686, 694 (4th Cir. 2007) (en banc) (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004) (en banc)).

## III.

The district court exercised diversity jurisdiction over this case under 28 U.S.C. § 1332, and we now have jurisdiction over PEC's appeal under 28 U.S.C. § 1291. A federal court exercising diversity jurisdiction must apply the substantive law of the state in which it sits. See Erie R.R. Co. v. Tompkins, 204 U.S. 64, 79 (1938); see also Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 599–600 (4th Cir. 2004). Because this appeal is taken from a federal district court in Virginia, we apply Virginia state law.

The Virginia Supreme Court has held that "when one furnishes labor to another under a contract which, for reasons not prejudicial to the former, is void and of no effect, he may recover the value of his services on a quantum meruit." Marine

10

Dev't Corp. v. Rodak, 300 S.E.2d 763, 765 (Va. 1983) (quoting Hendrickson v. Meredith, 170 S.E. 602, 604 (1933)). "It is a general rule of law that he who gains the labor of another must make reasonable compensation for the same." Id. (punctuation and citation omitted). However, the Virginia Supreme Court has also held that "where there is an express and enforceable contract in existence which governs the rights of the parties, the law will not imply a contract in contravention thereof." Royer v. Bd. of County Supervisors of Albemarle County, 10 S.E.2d 876, 881 (Va. 1940).

PEC bases its quantum meruit claim on the district court's holding that the parties' contract did not cover the disputed work, such that there was no contract to govern the parties' rights as to that work. PEC contends that in aligning the units it rendered a benefit to the City that the City accepted, and that the City had reasonable notice that PEC expected to be paid for the alignment work. Relying on Main v. Dep't of Highways, 142 S.E.2d 524, 531 (Va. 1965), the City responds that the parties' contract forecloses any recovery under a quantum meruit theory because the contract contains a provision requiring written change orders for price increases.

Main controls the outcome of this case and compels us to affirm the judgment of the district court. In Main, the

11

Virginia Supreme Court noted that change order provisions "are frequently embodied in building and construction contracts and are generally upheld." 142 S.E.2d at 529. Like PEC, the plaintiff in Main entered into a construction contract, performed extra work while satisfying its obligations under the contract, and sought to recover the cost of that extra work under a quantum meruit theory. The Main court found that "the written contract which the plaintiffs executed clearly provided the method by which they could insure the recovery of the cost of such extra work, and not having followed the prescribed method, they are not entitled to such recovery." Id. at 530–31.

Under Main, quantum meruit relief is not available to PEC because there is a valid, enforceable contract that governs the parties' rights and lays out a change order procedure requiring PEC to obtain approval from a designated person with authority to execute agreements on behalf of the City. PEC's own actions regarding the heat test run on Unit 1 and the ensuing proposed design changes demonstrate that it knew of and was able to follow this change order procedure. The record shows that City employees reminded PEC about the change order procedure, and that PEC was aware of the change order procedure, while work continued on Units 2 and 3. See J.A. 522–23, 639. PEC has not disputed the validity of the change order provision. Nor has it

12

supplied a reason for its failure to continue complying with the provision as work on the units progressed.  Like the plaintiffs in Main, PEC failed to follow the prescribed method outlined in the parties' contract to obtain approval and payment for extra work -- a method with which it was not only familiar, but which it had in fact utilized.

Although we are not unsympathetic to the fact that our decision likely allows the City to reap a substantial windfall, while sitting in diversity we are constrained to apply Virginia law as articulated by the Virginia Supreme Court.  Virginia law forecloses PEC's quantum meruit claim.


IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

13